UNITED STATES of America,
Appellee,

v.

Paul WILLIAMS, Defendant–Appellant.

Docket No. 05–0458 CR.

United States Court of Appeals,
Second Circuit.

Argued: Oct. 19, 2005.

Decided: March 22, 2006.

Alphonzo Grant, Assistant United States Attorney, Brooklyn, New York (Roslynn R. Mauskopf, United States Attorney for the Eastern District of New York, Susan Corkery, Assistant United States Attorney, Brooklyn, New York, on the brief), for Appellee.

J. Bruce Maffeo, New York, New York, for Defendant–Appellant.

Before: KEARSE, MINER, and HALL, Circuit Judges.

KEARSE, Circuit Judge.

Defendant Paul Williams appeals from a judgment of the United States District Court for the Eastern District of New York, Allyne R. Ross, *Judge*, revoking his supervised release and sentencing him to a three-year term of imprisonment. The district court found that Williams had violated the terms of his supervised release by committing crimes in violation of New York State ("State") law and federal law. On appeal, Williams contends (1) that the district court improperly based its findings on unreliable hearsay, and (2) that the sentence imposed was unreasonably long and was based on consideration of a statutorily prohibited sentencing factor. Finding no merit in his contentions, we affirm.

## I. BACKGROUND

In 1996, following a plea of guilty, Williams was convicted of armed robbery of a mail carrier in violation of 18 U.S.C. § 2114(a) and was sentenced to 78 months' imprisonment, to be followed by three years of supervised release. The conditions of release included the requirements that Williams abstain from drug use and attend a drug treatment program, that he not possess any firearms, and that he not commit any further federal or state crimes. Williams began serving his term of supervised release in June 2002.

### A. *The Charge of Supervised–Release Violation*

On September 18, 2002, the United States Probation Department ("Probation" or "Probation Department") learned from the New York City Police Department ("NYPD") that Williams was a suspect in the September 17, 2002 shooting and robbery of one Samuel Donnell Ryan. Probation asked the district court to issue an emergency warrant for Williams's arrest for violation of the terms of his supervised release. It described the following information received from the NYPD:

On September 18, 2002, Detective Schmalenberger of the NYPD's 101 Precinct contacted the undersigned officer to advise that the releasee was a suspect in [a] case involving the Shooting & Robbery of a citizen. On September 17, 2002, NYPD Detectives interviewed the victim, Samuel Donnel [*sic*] Ryan (Ryan), in the emergency room of Jamaica Hospital. Ryan related that on the afternoon of September 17, 2002, he went to pick up his cousin from school. Upon arriving at the destination, Ryan observed a group of individuals standing in front of a nearby apartment building. One of the individuals of the aforementioned party called Ryan over to the group of individuals. Ryan acquiesced and proceeded toward the groups [*sic*] direction. Simultaneously, the releasee emerged from a nearby building carrying a 9 millimeter firearm and shot Ryan in the left leg. After Ryan fell to the ground, the releasee robbed Ryan of his necklace, which was latched around Ryan's neck. Further probing of Mr. Ryan revealed that the aforementioned may have resulted from an apparent fight that Ryan had with releasee over an unknown female. We have provided a copy of the detective's investigation report for Your Honor's perusal. NYPD is in the process of ascertaining the releasee's whereabouts in order to arrest him.

In light of the aforementioned, coupled with the releasee's history of violence, history of firearms possession and history of drug use, we deem him to be a serious threat to the community. Therefore, we respectfully recommend that Your Honor sign the attached Probation Form 12C, ordering the issuance of a warrant.

(Probation Department Request for a[n] Emergency Warrant, dated September 19, 2002 (emphasis in original).)

The Probation Department thereafter filed with the district court a formal Violation of Supervised Release Report dated September 28, 2002 ("Formal Violation Report" or "Formal Report"). After repeating the above information from the NYPD as to the events of September 17, 2002, the Formal Report described the probation officer's ensuing contacts with Ryan:

> *On September 20, 2002*, the undersigned officer interviewed Ryan at Jamaica Hospital. In response to our inquiries, Ryan confirmed the manner in which the above-noted incident happened, however, *he denied ever identifying his assailant* or engaging in confrontation with the offender prior to the occurrence of the above-noted incident. Ryan also provided the attached written statement (see Exhibit 2 [referring to his assailant only as "someone" or an "individual"]).

> *During the evening of September 26, 2002, the undersigned officer received a telephone call from Ryan. At that time, Ryan advised that, contrary to his statements on September 20, 2002, he did identify the offender as his assailant during the above-noted incident.* Ryan, however, maintained that a prior confrontation between he [*sic*] and the offender never happened. *When asked why he failed to disclose this information during the previous interview, Ryan expressed that he felt vulnerable given his immobile state at Jamaica Hospital and feared that the offender would attempt to confront him at Jamaica Hospital if he (Ryan) provided any implicating information to law enforcement authorities.*

(Formal Violation Report at 4–5 (emphases added).)

The Formal Report charged Williams principally with (1) robbery in the first degree in violation of state law, (2) assault in the second degree in violation of state law, and (3) possession of a firearm as a convicted felon, in violation of 18 U.S.C. § 922(g). It also charged him with violating two conditions of supervised release relating to the use of controlled substances.

The Formal Report noted that the charges resulting from the events of September 17, 2002, were the third set of criminal charges brought against Williams. On November 1, 1994, Williams and an accomplice, armed with semi-automatic weapons, had taken $41,000 worth of United States Treasury and income tax refund checks from a postal carrier at gun point; Williams also fired his gun, although no one was injured. (*See id.* at 2). In addition,

> on April 20, 1995, [Williams] was arrested for attempted Robbery .... Subsequently, on September 12, 1995, he was convicted upon a plea of guilty to Attempted Robbery and sentenced to three years custody. Notably, during the commission of the Attempted Robbery offense, the defendant displayed a firearm and struck the complainant over the head with an unspecified instrument.

(*Id.*) The Formal Report recommended that, "[d]ue to the offender's dangerous, recidivist criminal behavior," the court, "upon a finding of violation of supervised release" revoke Williams's term of supervised release and impose a sentence near the maximum permissible term of imprisonment. (*Id.* at 9.)

## B. *The State Proceedings*

Williams was not captured until December 22, 2002, when he was arrested on unrelated charges of criminal trespass and robbery and gave his name as "Ronald

Richardson." NYPD Detective Jimmy Schmalenberger reinterviewed Ryan the next day. Ryan stated that his assailant on September 17, 2002, was Williams; he confirmed that he was acquainted with Williams, with whom he had grown up and who lived across the street from him. (*See* Police Complaint Follow Up Report dated December 24, 2002, at 1–2.) Detective Schmalenberger showed Ryan a picture of "Ronald Richardson"; Ryan identified the person in the photograph as Williams.

Detective Schmalenberger swore out a complaint against Williams, recounting, on information and belief, the September 17, 2002 events as described by Ryan, in which Williams shot Ryan in the thigh and stole Ryan's necklace. Ryan signed a supporting affirmation, stating,

> I, Samuel Donnell Ryan, have read the accusatory instrument filed in this action. The facts stated in that instrument to be on information furnished by me are true upon my personal knowledge.

(Ryan Affirmation dated December 23, 2002.) In January 2003, a State grand jury indicted Williams on nine counts. The indictment alleged, *inter alia*, that on or about September 17, 2002,

> — Williams, "with intent to cause the death of a person, attempted to cause the death of Samuel Donnell Ryan" (Count 1);
>
> — that Williams "forcibly stole certain property, to wit: personal property from Samuel Donnell Ryan, and in the course of the commission of the crime or of immediate flight therefrom, the defendant caused serious physical injury to Samuel Donnell Ryan who was not a participant in the crime" (Count 2);
>
> — that Williams "forcibly stole certain property, to wit: personal property from Samuel Donnell Ryan, and in the course of the commission of the crime or of

immediate flight therefrom, the defendant was armed with a deadly weapon, to wit: a firearm" (Count 3);

> — that Williams, "with intent to cause serious physical injury to a person, caused such injury to Samuel Donnell Ryan by means of a deadly weapon" (Count 4); and
>
> — that, "under circumstances evincing a depraved indifference to human life," Williams "recklessly engaged in conduct which created a grave risk of death to another person in that the defendant did aim and discharge a loaded weapon at and in the direction of another person" (Count 8).

(*People v. Ronald Richardson, AKA Paul Williams*, Indictment Counts 1, 2, 3, 4, and 8.)

On January 17, 2003, Detective Schmalenberger filed a report stating that Ryan had complained of receiving a threatening visit to his home by one Thyra Davis and her brother. Davis was Williams's girlfriend, and she offered Ryan money if he would not testify against Williams. When Ryan refused her offer, Davis said, "You will get yours if you testify, and we will have someone make a report so you get locked up so you can't testify." (Police Complaint Report of "TAMPERING W/WITNESS" dated January 17, 2003 ("Witness Tampering Report").)

In July 2004, Williams reached a plea agreement with the State and pleaded guilty to a misdemeanor charge of second-degree reckless endangerment. The Assistant District Attorney informed the State court that the State recommended a sentence of one year of imprisonment and that the remaining charges against Williams would be dropped. Williams's attorney stated

> [t]hat is acceptable to my client. He has authorized me to withdraw his previous-

ly entered plea of not guilty, and enter a plea of guilty to the lesser included offense of Reckless Endangerment Second Degree as a class A misdemeanor ....

. . . .

THE COURT [addressing Williams]: Is it correct that you want to plead guilty to an A misdemeanor, Reckless Endangerment in the Second Degree?

THE DEFENDANT: Yes.

. . . .

THE COURT: By pleading guilty, you are admitting that on September 17, 2002 in Queens County, you recklessly engaged in conduct which created a substantial serious physical injury to another person.

Is that true?

THE DEFENDANT: Yes.

(State Court Plea Transcript, July 19, 2004 ("State Plea Tr."), at 2, 4, 5.)

By the time he entered that plea of guilty, Williams had been in State custody for more than a year. He was shortly transferred to federal custody to face the charges of supervised-release violation.

## C. *The Proceedings in the District Court*

Williams's release revocation hearing commenced on December 8, 2004. Ryan did not testify. The government stated that it had been unable to locate him, that it was still trying to find him and wanted to call him as a witness, but that he might be unwilling to testify. The government called as witnesses the police officers and probation officer who had interviewed Ryan, having them testify to Ryan's various out-of-court statements. Those witnesses described the accounts set out above, including the sequence of Ryan's identifications and refusals to identify Williams in 2002:

— September 17: at the scene of the crime, Ryan told the police that he did not know his assailant;

— September 17: at the hospital, Ryan told the police that he had been shot by Williams;

— September 20: at the hospital, Ryan confirmed to the probation officer the details of the shooting, but denied having identified Williams as his assailant; he also gave a handwritten statement that did not name Williams;

— September 26: Ryan told the probation officer that Williams was his assailant;

— December 23: following Williams's arrest, Ryan told Detective Schmalenberger that Williams was his assailant; Ryan identified Williams in a photograph and so indicated in writing on the photograph;

— December 23: after Detective Schmalenberger swore out a complaint against Williams following Ryan's identification of Williams's picture, Ryan signed a statement affirming that the information-and-belief allegations in the complaint were true based on Ryan's first-hand knowledge.

In addition, the government presented the January 17, 2003 NYPD Witness Tampering Report, which stated that Ryan, in complaining of the threats received from Williams's girlfriend, again identified Williams as his assailant.

The district court adjourned the hearing until December 21, giving the government a further opportunity to attempt to locate Ryan and persuade him to testify. At the resumption of the hearing, however, the government remained unable to produce Ryan.

Williams, in defense, submitted to the court a typewritten document headed *"AF-*

FIDAVIT," ostensibly signed by Ryan, which stated as follows:

> On September 17, 2002 I was shot in the leg while picking up my nephew from P.S. 105. I had arrived at the school in my car and when I was getting out of my car a guy I do not know called my name.
>
> I walked toward the guy who called my name and the guy took out a gun and shot me in the leg. I had never before seen the guy who shot me and I do not know his name.
>
> Police Officers had asked me about a guy I know by the name of Paul Williams, who is also known as Ronald Richardson. Paul is not the guy who shot me in the leg.
>
> I know that Paul was arrested and charged with shooting me, but I do not want to go to Court against Paul because he is not the guy who shot me.
>
> I have not been forced or threatened in any way to sign this statement and I am doing it of my own free will.

This document was neither dated nor sworn to. Williams's former attorney, who had prepared the document, testified that he had no first-hand knowledge that the signature on it was Ryan's.

The district court thereafter issued a series of opinions, described below, in which it, *inter alia*, found that the government had proven by a preponderance of the evidence that on September 17, 2002, Williams, in violation of his supervised release, shot Ryan; found that Ryan had been dissuaded from testifying as a result of intimidation by Williams; ordered the government to make another attempt to have Ryan testify; and accepted the government's report, following such an attempt, that Ryan reasonably feared for his own safety and that of his family.

In its first Opinion and Order, dated December 22, 2004 ("*Williams I*"), the court observed that the various statements made by Ryan during the course of the investigation with respect to the identification of Williams had been inconsistent; but it found that each of Ryan's refusals to identify Williams was the result of feared reprisals and the receipt of threats:

> The victim's unwillingness to identify his assailant at the scene of the crime, in a neighborhood that he frequented and potentially within earshot of those associated with Williams, is understandable. The court is not surprised that a victim in such circumstances, after being shot in broad daylight on a relatively busy street, would be reluctant to identify his assailant.

*Williams I* at 1. The court noted that after Ryan had identified Williams and Williams had been arrested and charged in Ryan's shooting, Ryan had contacted the police and

> complained that the defendant's girlfriend and her brother had visited Ryan's residence. Ryan told Detective Schmalenberger that after he refused an offer of money not to testify, defendant's girlfriend said "You will get yours if you testify, and we will have someone make a report so you get locked up so you can't testify." . . . . *Ryan has had little, if any, contact with law enforcement since complaining of the threat, demonstrating that the threat effectively dissuaded him from testifying.*

*Id.* at 3 (emphasis added). The court found that the Ryan "*AFFIDAVIT*" submitted at the hearing by Williams was simply a product of Williams's intimidation of Ryan:

> Ryan was apparently so convinced that the threat would come to fruition if he testified that he agreed to sign an affidavit prepared by then-defense counsel Jayson Russo. The affidavit apparently

signed by Ryan, which is neither dated nor notarized, states that the defendant did not shoot him. The affidavit further states that Ryan does not want to testify against the defendant. Russo testified that Ryan signed the affidavit "long before" defendant plead to a misdemeanor in state court in July of 2004, and the evidence suggests that it was signed at some point after January 2003. *The court thus finds, notwithstanding defense counsel's emphasis to the contrary, that the affidavit is no more than a confirmation by Ryan, after he had been threatened, that he did not wish to testify against defendant.*

*Id.* (emphasis added). The court concluded that

> Samuel Ryan's story is both compelling and credible. Its inconsistencies are explained by his fear of identifying and testifying against the defendant, fears that the court finds to be reasonable .... The evidence indicates that Ryan remained willing to identify Williams as his assailant until he had been threatened by defendant's girlfriend and her brother, at which point he no longer wanted anything to do with the prosecution of this case. *The court finds that the victim's fear is reasonable in light of the daring nature of the mid-afternoon shooting that occurred on a busy street.* As noted above, that fear suggests that the affidavit prepared by Russo, then-counsel to defendant, and signed by Ryan was a final statement that Ryan would not testify in this case. *The court thus finds Ryan's identification of Williams, based as it is on testimony from detectives and documentary evidence, to be credible and any inconsistencies in his statements to have been explained.*

*Id.* at 3–4 (emphases added).

The court also found that Ryan's identification of Williams as his assailant was corroborated by Williams's guilty plea and his post-attack conduct that suggested a consciousness of guilt. Williams could not be found at any of the addresses he had given the Probation Department; he failed to appear for his required drug treatment; and when arrested he gave the police an alias rather than his real name. *See id.* at 4. The court added:

> Even more significantly, on July 19, 2004, defendant plead guilty in state court to reckless endangerment in the second degree, a misdemeanor offense, arising out of the shooting of Samuel Ryan. *When the judge asked whether defendant admitted that he had "recklessly engaged in conduct which created a substantial serious physical injury to another person," the defendant affirmed that he had ....* While defense counsel rightly noted that the plea included time-served and would have resulted in the defendant's release as of that date but for the instant action, the allocution is not rendered meaningless by those circumstances. *Acknowledging the circumstances of the allocution, the court finds that the defendant plead guilty to a crime arising from the September 17, 2002 shooting of Samuel Ryan and that the defendant's plea further corroborates the victim's statements.*

*Williams I* at 4–5 (emphases added). The court found, in light of all the evidence, that the government had established by a preponderance of the evidence that Williams shot Ryan and stole his necklace, in violation of the terms of Williams's supervised release.

In an Opinion and Order dated January 3, 2005 ("*Williams II*"), issued as an addendum to *Williams I*, the district court noted that, under Fed.R.Crim.P. 32.1, Williams was " 'entitled to ... an opportu-

nity to ... question any adverse witness unless the court determines that the interest of justice does not require the witness to appear.'" *Williams II* at 2 (quoting Fed.R.Crim.P. 32.1(b)(2)(C)). The court found that the government had made good faith efforts to locate Ryan and persuade him to testify. *See Williams II* at 2. The court also observed that

> Williams's history of violent conduct, as well as the threats that led Ryan to file a police complaint on January 17, 2003, made reprisal against Ryan a possibility. The court finds this reason adequate to explain Ryan's reticence to testify and the government's failure to call him.

*Williams II* at 3. The court also found that the testimony of the officers as to Ryan's identification of Williams was reliable for the reasons stated in *Williams I,* and was "particularly reliable in light of Williams's plea on July 19, 2004 in state court to a misdemeanor offense arising out of the shooting of Samuel Ryan." *Williams II* at 3. Thus, the court concluded that Williams's interest in confronting Ryan was outweighed by the government's grounds for not producing Ryan and the reliability of the evidence presented by the government.

Nonetheless, at a January 4, 2005 hearing, the court ordered the government to make another attempt to get Ryan to testify by serving him with a subpoena. Thereafter, in an Opinion and Order dated January 18, 2005 ("*Williams III*"), the court noted that the government had made the required attempt and that it for good reasons declined to ask the court to enforce the subpoena:

> By letter dated January 14, 2005, the government indicated that it served Ryan with a subpoena on January 11, 2005. During a meeting with the government on January 12, 2005, however, *Ryan explained that he had received*

*numerous threats from associates of Williams discouraging him from testifying.* According to the government, *Ryan adamantly stated that he would not testify, out of concern for his safety and the safety of his family.* Believing Ryan's fears to be genuine, the government has chosen not to call Ryan as a witness. The probation department has similarly indicated that it is reasonable that Ryan not appear as a witness. The department has detailed the threats received by Ryan in a memorandum to the court and stated that it believes his fears to be credible.

> The court now finds that the government has made sufficient efforts to locate the complaining witness and to persuade him to testify, in order to provide for confrontation.... The court accepts the validity of the government's stated reasons for not calling the hearsay declarant. *Williams' history of violent conduct, and the numerous threats directed by Williams's associates toward Ryan, make reprisal against Ryan a serious possibility if he were to testify.*

*Williams III* at 1–2 (emphases added). Relying in addition on its analysis in *Williams II* that found the government's evidence to be reliable, the court concluded as follows:

> Having balanced the defendant's right of confrontation wit[h] the government's grounds for not allowing confrontation ... and with the reliability of the evidence offered by the government, the court finds that the reasons for admitting the hearsay testimony outweigh Williams's right to confront the complaining witness.

*Williams III* at 2–3 (internal quotation marks omitted).

On January 19, 2005, the district court sentenced Williams to three years' imprisonment. In an Opinion and Order dated

February 9, 2005 (*"Williams IV"*), the court noted this Court's decision in *United States v. Fleming,* 397 F.3d 95 (2d Cir. 2005), in the wake of the Supreme Court's invalidation of the United States Sentencing Guidelines, *see United States v. Booker,* 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), and explained its sentence "[i]n order to aid the Court of Appeals' review of this case," *Williams IV* at 2. The court stated as follows:

> The court notes preliminar[il]y that Williams is a violent offender who has provided the court no indication that he has undergone any reform since he was first incarcerated on federal charges. Williams served three years in state incarceration beginning in 1995 after pleading guilty to attempted robbery. As related in the pre-sentencing report for the instant case, however, a New York City police report indicates that during the attempted robbery, Williams displayed a gun and struck his victim in the head with an unspecified instrument. He was nineteen years old at the time. Williams was originally convicted of federal charges in 1996 for the armed robbery of a postal worker, perpetrated with one other person. During the robbery, one of the men brandished a Tech Nine semi-automatic firearm. The other displayed a firearm while rifling through the letter carrier's mail bag. As the men fled, one discharged his firearm, but no one was injured. According to accomplice testimony, as reflected in Williams' pre-sentencing report, it was Williams who possessed the firearm that was discharged. After serving time in prison following his conviction for this robbery, while on supervised release in 2002, Williams brazenly shot a man in broad daylight, wounding him. As is apparent from this brief recitation of his criminal history, Williams has already compiled, at a tender age, a weighty history of violent acts perpetrated with apparent disregard for the consequences either for himself or his victims.

> *In light of the defendant's background and the nature of his offense, the court determined that the most severe sentence that could be imposed, three years' incarceration, was warranted as punishment for violating his supervised release.* While this sentence reflects the seriousness of the offense and, the court hopes, will provide some deterrence from further criminal conduct by the defendant, the court was most concerned with protecting the public from further crimes of the defendant when it imposed the three year sentence. The court considered the guidelines range in reaching its sentencing decision. Having committed a Class B felony and as a defendant in Criminal History Category II, Williams' guidelines range was 15–21 months. *The court considered imposing a sentence[ ] within this range but concluded that such a sentence would insufficiently reflect the seriousness of defendant's crime and sought greater protection of the public from further crimes by the defendant.* The court also could have sentenced defendant to a lesser term of imprisonment to be followed by another period of supervised release. While the court considered imposing such a sentence, it decided, given defendant's track record, that supervised release would do little to deter defendant from committing further crimes, perhaps of a violent nature. The court thus found it appropriate to give defendant the maximum sentence of three years' imprisonment.

*Williams IV* at 2–3 (emphases added).

## II.  DISCUSSION

On appeal, Williams contends that the district court (1) improperly admitted and

credited the hearsay evidence identifying him as Ryan's assailant, and (2) improperly based his sentence on consideration of a statutorily prohibited factor. Neither contention has merit.

A. *The Admission of Ryan's Hearsay Identifications of Williams*

■ Although the Confrontation Clause of the Sixth Amendment does not apply to supervised-release revocation hearings, *see United States v. Aspinall*, 389 F.3d 332, 342–43 (2d Cir.2004) ("*Aspinall* ") (discussing *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004)), the Federal Rules of Criminal Procedure provide that in such a hearing the judge must give the defendant "an opportunity ... to question any adverse witness, unless the judge determines that the interest of justice does not require the witness to appear." Fed.R.Crim.P. 32.1(b)(2)(c) (2002). This requirement reflects the principle stated in *Morrissey v. Brewer*, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972), that the "minimum requirements of due process" in a parole revocation hearing include the right of the defendant to "confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation)," *id.* at 489, 92 S.Ct. 2593; *see also Gagnon v. Scarpelli*, 411 U.S. 778, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973) (extending *Morrissey* to probation revocation hearings).

■ In such a hearing, neither the Due Process Clause nor Rule 32.1 obliges the district court to perform a good-cause analysis with respect to a "proffered out-of-court statement [that] is admissible under an established exception to the hearsay rule." *Aspinall*, 389 F.3d at 344; *see United States v. Jones*, 299 F.3d 103, 113 (2d Cir.2002) ("firmly rooted" hearsay exception); *see also Gagnon*, 411 U.S. at 782,

93 S.Ct. 1756 n. 5. On the other hand, if the statement does not fall under such an exception, Rule 32.1 requires the court to determine whether good cause exists to deny the defendant the opportunity to confront the adverse witness. In making that determination, the court must balance, on the one hand, the defendant's interest in confronting the declarant, against, on the other hand, the government's reasons for not producing the witness and the reliability of the proffered hearsay. *See, e.g., United States v. Chin*, 224 F.3d 121, 124 (2d Cir.2000); *Aspinall*, 389 F.3d at 343–45.

■ In the balancing process, the defendant's interest in confronting the declarant is entitled to little, if any, weight where the declarant's absence is the result of intimidation by the defendant: Where a defendant has procured the declarant's unavailability "by chicanery, ... by threats, ... or by actual violence or murder," the defendant is deemed to have "waived his sixth amendment rights and, *a fortiori*, his hearsay objection" to the admission of the declarant's statements. *United States v. Mastrangelo*, 693 F.2d 269, 272–73 (2d Cir. 1982), *cert. denied*, 467 U.S. 1204, 104 S.Ct. 2385, 81 L.Ed.2d 343 (1984); *see also United States v. Miller*, 116 F.3d 641, 667–68 (2d Cir.1997), *cert. denied*, 524 U.S. 905, 118 S.Ct. 2063, 141 L.Ed.2d 140 (1998); *United States v. Thai*, 29 F.3d 785, 814 (2d Cir.), *cert. denied*, 513 U.S. 977, 115 S.Ct. 456, 130 L.Ed.2d 364 (1994); *United States v. Aguiar*, 975 F.2d 45, 47 (2d Cir.1992); *United States v. Potamitis*, 739 F.2d 784, 788–89 (2d Cir.), *cert. denied*, 469 U.S. 918, 105 S.Ct. 297, 83 L.Ed.2d 232 (1984). The *Mastrangelo* principle allows the court—even at trial—to admit unsworn statements of a witness, whose planned testimony was withheld in response to the defendant's intimidation, in the form of hearsay evidence from a law enforcement officer as

to the witness's prior statements. *See, e.g., United States v. Aguiar,* 975 F.2d at 47; *see also Aspinall,* 389 F.3d at 344 (in supervised-release revocation proceedings, "the normal evidentiary constrictions" applicable to trials are "relaxed").

The *Mastrangelo* principle is essentially codified in Fed.R.Evid. 804(b)(6), which provides that evidence of an out-of-court statement by an unavailable declarant is "not excluded by the hearsay rule" when "offered against a party that has engaged or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness." Fed. R.Evid. 804(b)(6). This exception to the hearsay rule was added to Rule 804(b) in 1997

> to provide that a party forfeits the right to object on hearsay grounds to the admission of a declarant's prior statement when the party's deliberate wrongdoing or acquiescence therein procured the unavailability of the declarant as a witness. This recognizes the need for a prophylactic rule to deal with abhorrent behavior "which strikes at the heart of the system of justice itself." *United States v. Mastrangelo,* 693 F.2d [at] 273.... The wrongdoing need not consist of a criminal act.

Fed.R.Evid. 804 Advisory Committee Note (1997). While we do not characterize this exception as a long established or firmly rooted exception that eliminates the requirement for a Rule 32.1 balancing analysis, its recognition that a defendant's wrongful conduct causing the witness's absence "strikes at the heart of the system of justice" at the very least illustrates that in the balancing process, such a defendant's interest in examining the declarant is eviscerated.

■ We review the court's balancing of the Rule 32.1 factors for abuse of discretion. *See, e.g., United States v. Jones,* 299

F.3d at 112. Abuse of discretion encompasses clearly erroneous findings of fact and misapplications of the law.

■ In the present case, we see no abuse of discretion in the court's balancing of the relevant factors. In evaluating the reliability of the government's evidence of Ryan's identifications of Williams, the court considered the full range of statements made by Ryan to the police officers and the probation officer, the circumstances under which the conflicting statements were made, and Ryan's explanations that he had declined to identify Williams at the scene of the shooting and while he was immobilized in the hospital because he feared reprisal. In assessing both the reasonableness of Ryan's explanations for his inconsistent statements and the reasonableness of the government's decision not to insist that Ryan testify, the court considered Ryan's statements that he had received numerous threats from Williams's associates, had felt compelled to change his residence and work schedule several times in an effort to avoid receiving further threats, and feared for his own safety and that of his family. The court found these statements and Ryan's explanations credible in light of, *inter alia,* the facts that Ryan made a formal complaint to the police that he had been threatened by Williams's girlfriend not to testify against Williams, and that Ryan had apparently been willing to testify against Williams in the State proceeding until he received that threat. The court found that Ryan's fears—and the government's decision not to seek to compel his testimony—were reasonable in light of Williams's well-documented history of violence.

The court permissibly found that Ryan's well-founded fear of retribution from Williams and his associates explained why on two occasions Ryan had refused to accuse Williams to the authorities, and found

that the statements that instead identified Williams as Ryan's assailant were reliable. The court found confirmation for Ryan's identification of Williams in, *inter alia,* Williams's conduct in absconding and using an alias after the shooting, and in the fact that Williams pleaded guilty in State court to recklessly inflicting "substantial serious physical injury to another person" (State Plea Tr. at 5) in satisfaction of the indictment that charged him with many offenses expressly related to the shooting and robbing of Ryan on September 17, 2002.

After requiring the government to make an additional effort to get Ryan to testify at Williams's hearing, and after hearing all of the evidence and the government's report as to Ryan's receipt of threats by associates of Williams, the court gave little weight to the defendant's interest in examining Ryan, finding that Ryan's adamant refusal to testify was the product of Williams's intimidation. The evidence discussed above supports the court's factual finding.

In sum, we see no abuse of discretion in the district court's balancing of the Rule 32.1 factors and in its consequent admission of the hearsay testimony as to Ryan's identification of Williams as his assailant. The record thus amply supports the judgment revoking Williams's supervised release on the grounds that Williams committed assault and robbery in violation of State law and possessed a firearm in violation of 18 U.S.C. § 922(g).

B. *The Court's Consideration of an Allegedly Impermissible Factor*

■ Williams also argues that the sentence imposed on him was unreasonable because the court considered a factor that Williams contends was impermissible: the seriousness of his offense. His argument is based on the fact that 18 U.S.C. § 3583, which governs supervised release, lists certain subsections of 18 U.S.C. § 3553(a) that the court is expressly required to consider in determining punishment for a violation of supervised release, but does not list subsection (a)(2)(A). As subsection (a)(2)(A) of § 3553 provides that the court is to consider the need for the sentence imposed "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense," and is not mentioned in § 3583(e), Williams contends that "the 'seriousness of the offense' factor set forth in Section 3553(a)(2)(A)" was "specifically excluded from consideration" and is "inapplicable to the district court's inquiry upon a revocation of supervised release." (Williams brief on appeal at 23.) We disagree.

■ Subsection (e) of § 3583, which governs, *inter alia,* revocation of supervised release, provides that

[t]he court may, after considering the factors set forth in section 3553(a)(1), (a)(2)(B), (a)(2)(C), (a)(2)(D), (a)(4), (a)(5), (a)(6), and (a)(7)—

. . . .

(3) revoke a term of supervised release, and require the defendant to serve in prison all or part of the term of supervised release authorized by statute for the offense that resulted in such term of supervised release without credit for time previously served on postrelease supervision, if the court . . . finds by a preponderance of the evidence that the defendant violated a condition of supervised release . . . .

18 U.S.C. § 3583(e)(3). Section 3583 does not state that any particular factor cannot be considered, and we interpret § 3583(e) simply as requiring consideration of the enumerated subsections of § 3553(a), without forbidding consideration of other pertinent factors.

Further, § 3583(e) cannot reasonably be interpreted to exclude consideration of the seriousness of the releasee's violation, given the other factors that must be considered. Sections 3553(a)(1), (a)(2)(B), and (a)(2)(C), which are among the sections the court is expressly required to consider, provide that

[t]he court in determining the particular sentence to be imposed, shall consider—

(1) the nature and circumstances of the offense and the history and characteristics of the defendant; [and]

(2) the need for the sentence imposed—

. . . .

(B) to afford adequate deterrence to criminal conduct; [and]

(C) to protect the public from further crimes of the defendant . . . .

18 U.S.C. § 3553(a). It may be possible for the court, in considering these factors and the other factors adverted to in § 3583(e), to avoid considering a need to promote respect for the law and a need to provide just punishment for the offense, which, along with the seriousness of the offense, are the factors set out in § 3553(a)(2)(A). But we cannot see how, in order to impose a sentence that will provide "adequate deterrence," *id.* § (a)(2)(B), and protection of the public from "further crimes of the defendant," *id.* § (a)(2)(C), in light of "the nature and circumstances of the offense," *id.* § (a)(1), the court could possibly ignore the seriousness of the offense.

Thus, we conclude that under the pertinent statutory provisions, the court in sentencing a defendant for violation of supervised release may properly consider the seriousness of his offense. If further confirmation of that conclusion is required, we find it in the legislative history of § 3553(a)(1), which indicates that, by the "nature" of the offense, Congress meant, *inter alia,* "the amount of harm done by the offense, whether a weapon was carried or used, . . . and whether there were any particular aggravating or mitigating circumstances surrounding the offense." S.Rep. No. 98–225, at 75 (1984), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3258.

## CONCLUSION

We have considered all of Williams's arguments on this appeal and have found them to be without merit. The three-year sentence of imprisonment imposed on Williams is reasonable in light of the factors discussed by the district court in *Williams IV.* The judgment is affirmed.