19-3841-cr
United States v. Diaz

# United States Court of Appeals
# for the Second Circuit

AUGUST TERM 2020
No. 19-3841


UNITED STATES OF AMERICA,
Appellee,


v.


ROBERT DIAZ,
Defendant-Appellant.


SUBMITTED: NOVEMBER 13, 2020
DECIDED: JANUARY 27, 2021


Before:      JACOBS, POOLER, BIANCO, Circuit Judges.

Robert Diaz appeals from a judgment of the United States District Court for the

Southern District of New York (Ramos, J.) revoking his supervised release and

sentencing him principally to a 24-month term of imprisonment.   On appeal, Diaz

argues that (1) the admission of certain identification testimony violated his right to due

process; and (2) the admission of several hearsay statements without a finding of good cause violated Federal Rule of Criminal Procedure 32.1(b)(2)(C).   We affirm.

_____

SARAH BAUMGARTEL AND YUANCHUNG LEE, Federal Defenders of New York, Inc., New York, NY for Defendant-Appellant Robert Diaz.

BRETT M. KALIKOW, Assistant United States Attorney (Hagan Scotten, Assistant United States Attorney, on the brief), for Audrey Strauss, United States Attorney for the Southern District of New York, for Appellee United States of America.

DENNIS JACOBS, Circuit Judge:

After Raymond Melo was nearly killed during a robbery inside a Bronx apartment complex, he twice identified the perpetrator as Defendant-Appellant Robert Diaz, who was then on supervised release.   Several evidentiary issues arose because Melo was a reluctant witness who denied at the revocation hearing that he ever identified Diaz as the attacker.   The United States District Court for the Southern District of New York (Ramos, J.) nonetheless relied on Melo's prior identifications (as well as testimony from other witnesses) and found by a preponderance of the evidence that Diaz had committed the attack.   Supervised

2

release was revoked and Diaz was sentenced principally to 24-months imprisonment.

Diaz raises two issues on appeal. First, he argues that the district court's reliance on Melo's two out-of-court identifications violated his right to due process. Second, he argues that the district court failed to make a finding of good cause before relying on hearsay statements that Melo and his girlfriend Ashley allegedly made to law enforcement during the investigation.

Neither contention is grounds for vacatur. Even though the procedures used to obtain Melo's out-of-court identifications were unduly suggestive, both identifications were nonetheless reliable. Accordingly, the district court did not clearly err by admitting them. See Neil v. Biggers, 409 U.S. 188, 199 (1972). Also, because Melo testified at the supervised release hearing, the district court was not required to find good cause before admitting his hearsay statements under Federal Rule of Criminal Procedure 32.1(b)(2)(C). And although the district court erred by admitting Ashley's hearsay statements without first finding good cause, that error was harmless given the overwhelming evidence of Diaz's guilt. Therefore, we **AFFIRM** the revocation of supervised release.

**I**

A pre-dawn 911 call on June 16, 2018 reported that a violent robbery was underway in a Bronx apartment complex called the Lambert Houses. Frederick Pimentel, who placed the call, overheard the robbery taking place outside his closed apartment door. He heard the victim plead, "here . . . Take it . . . You cut me like 50 times already" and the attacker respond, "[y]eah, you made me cut myself too . . . What else [do] you have in your pocket?" App'x. at 100.

NYPD Sergeant James Lundy arrived at the Lambert Houses within several minutes to find Melo slumped over at a nearby bus stop suffering from numerous stab wounds. Melo managed to tell Sgt. Lundy that the attacker had an M-shaped tattoo on his neck, was wearing khaki pants but no shirt, and had been cut during the attack.

The next morning, Melo's girlfriend Ashley was with Melo at the hospital, and in touch with NYPD Detective Daniel Martinez. She texted Det. Martinez a screenshot of an Instagram page that she believed belonged to Melo's attacker and told him over the phone that Melo's assailant was known as "Knightmare."

4

Det. Martinez then paged through an NYPD database of Lambert Houses residents and pulled the mugshot of a man who appeared to match the Instagram page and who had a large neck tattoo. The mugshot was of Diaz.

The following day, Det. Martinez came to see Melo at the hospital. Early in their conversation, Melo agreed to identify his attacker but made clear that he did not want to testify in court. He proceeded to tell Det. Martinez that he encountered a man in the stairwell of the Lambert Houses who had a neck tattoo resembling the Maserati logo.[1] The man commented on Melo's chain and then lunged at him, stabbing Melo numerous times in an attempt to wrest the chain from its owner. At some point, Melo cut the assailant's face with a box cutter. Melo added that the attacker also lived in the Lambert Houses and went by the nickname "Knightmare." At that point, Det. Martinez showed Melo the mugshot he had pulled from the database. Without hesitation, Melo identified Diaz.

A few days later, Diaz met with his probation officer, Elisha Rivera. P.O.

---

[1] Automobile manufacturer Maserati was founded in Bologna and uses Neptune's trident, which is associated with that city, as its logo. Because the trident is upside-down on Diaz's neck, the tattoo is in the shape of the letter "M."

Rivera inquired about a deep, fresh-looking wound she observed next to Diaz's eye. Diaz explained that he had been cut in a street fight.

Melo was interviewed three months later by Special Agent Scott McNeil. Diaz had been arrested in the interval, but the Bronx District Attorney's Office dropped its case against him because Melo refused to cooperate. Melo repeated to S.A. McNeil much of what he had told Det. Martinez: his attacker had a neck tattoo resembling the Maserati logo, and he struck the assailant's face during the robbery. S.A. McNeil then administered a photo array. One of the six photos in the array was the Diaz mugshot that Melo had previously selected in the hospital. Melo confidently selected the photo of Diaz and identified him as "the one who stabbed me." App'x at 182. But he reiterated that he would lie on the stand if required to testify against Diaz.

## II

Diaz, who had been convicted of being a felon in possession of a firearm in 2017, was on supervised release when Melo was attacked. One condition of Diaz's supervised release was that he avoid engaging in further criminal

6

conduct; so after Melo twice identified him as the perpetrator of a violent robbery, the United States Probation Department filed a violation report in the district court.[2]   Diaz was arrested at his apartment in the Lambert Houses in January 2019.

At the revocation hearing, testimony was given as to the events described above by Pimentel, Sgt. Lundy, Det. Martinez, P.O. Rivera, and S.A. McNeil. Melo also took the stand (notwithstanding his resolve not to testify) but gave testimony that was largely inconsistent with his own prior statements.   On direct examination, Melo testified: that he never mentioned an M-shaped neck tattoo or said he knew his attacker as "Knightmare"; that he saw a mugshot in the hospital but did not make an identification; and that he did not identify anyone in the six-person photo array as his attacker.   Diaz's counsel cross-examined him briefly.

---

[2] In total, the report alleged 18 violations of supervised release, four of which stemmed from the Melo assault: (1) robbery in the first degree, (2) assault in the first degree, (3) attempted murder in the second degree, and (4) possession of a weapon in the first degree.   Diaz pled guilty to four other less serious violations relating to marijuana use and failure to report, and the government eventually dismissed ten more.

Det. Martinez and S.A. McNeil, who testified next, recounted their conversations with Melo, including the two positive identifications of Diaz. This testimony was offered for its truth (not just for impeachment). The district court deferred ruling on its admissibility until after the hearing.

The parties then briefed two outstanding evidentiary issues: (1) whether Melo's two out-of-court identifications were admissible under the Due Process Clause, and (2) whether Melo and Ashley's hearsay statements (introduced through the testimony of Det. Martinez and S.A. McNeil) were admissible under the relaxed evidentiary standards that govern revocation proceedings. The district court ruled for the government on both issues. It then found that Diaz had committed the stabbing by a preponderance of the evidence, revoked his supervised release, and sentenced him principally to the statutory maximum of 24 months in prison.

On appeal, Diaz renews his challenge to Melo's out-of-court identifications, contending that both were unreliable and therefore inadmissible under the Due Process Clause (Point III below). Second, he points out that the district court failed to find good cause before admitting various hearsay

8

statements, in violation of Federal Rule of Criminal Procedure 32.1(b)(2)(C) (Point IV below).

## III

Due process protects "the right not to be the object of suggestive police identification procedures that create a very substantial likelihood of irreparable misidentification." United States v. Concepcion, 983 F.2d 369, 377 (2d Cir. 1992) (internal quotation marks omitted). "[T]he linchpin in determining the admissibility of identification testimony" is reliability. Manson v. Brathwaite, 432 U.S. 98, 114 (1977). If the procedures used to obtain an identification are unduly suggestive, "due process requires that the identification testimony be excluded unless a threshold level of reliability can be established through evidence that is independent of the suggestive procedure." Dunnigan v. Keane, 137 F.3d 117, 128 (2d Cir. 1998), abrogated on other grounds by Perry v. New Hampshire, 565 U.S. 228, 248 (2012). "We review the district court's determination of the admissibility of identification evidence for clear

9

error." United States v. Douglas, 525 F.3d 225, 242 (2d Cir. 2008) (internal quotation marks omitted).

The first inquiry is "whether the pretrial identification procedures unduly and unnecessarily suggested that the defendant was the perpetrator." Raheem v. Kelly, 257 F.3d 122, 133 (2d Cir. 2001). Even if an identification is improperly suggestive, "the witness's identification of the suspect . . . is still admissible if the identification has independent reliability." United States v. Eltayib, 88 F.3d 157, 167 (2d Cir. 1996).

Here, the government concedes that both of Melo's identifications were obtained by unduly suggestive procedures. See Appellee Br. at 12. The practice of showing a witness a single photo (as opposed to an array) "has been widely condemned," Stovall v. Denno, 388 U.S. 293, 302 (1967) (footnote omitted), abrogated on other grounds by United States v. Johnson, 457 U.S. 537 (1982), so the hospital show-up was unduly suggestive. The six-photo array fares no better. An array is unduly suggestive if the defendant "meets the description of the perpetrator previously given by the witness and the other [array] participants obviously do not." See Raheem, 257 F.3d at 134. Melo

10

previously reported that his assailant had a large neck tattoo, and Diaz was the only person in the array with such a tattoo (though it is asking a lot to find five other fellows with large neck tattoos).

Diaz's appeal therefore concerns only the second inquiry--whether the identifications were nonetheless reliable. The five factors set out in Neil v. Biggers guide that analysis:

> [1] the opportunity of the witness to view the criminal at the time of the crime, [2] the witness' degree of attention, [3] the accuracy of the witness' prior description of the criminal, [4] the level of certainty demonstrated by the witness at the confrontation, and [5] the length of time between the crime and the confrontation.

409 U.S. 188, 199–200 (1972). No one factor is generally dispositive. Concepcion, 983 F.2d at 377. Collectively, the Biggers factors confirm that Melo's identifications of Diaz were independently reliable notwithstanding the suggestive means used to obtain them.

As to opportunity to view, the attacker was unmasked, the hallway was well-lit, the two men spoke, and the attack lasted over a minute. Although Melo was initially assaulted from behind, he ended up face-to-face with the attacker, slashed the attacker in the face, and provided a detailed description of

the tattoo on the attacker's neck. See Dunnigan, 137 F.3d at 129 (this factor favored admissibility because the witness engaged "in hand-to-hand combat" with the assailant).

As to the degree of attention, it was likely high because Melo was a victim. See United States ex rel. Phipps v. Follette, 428 F.2d 912, 915 (2d Cir. 1970) (reasoning that a victim pays more attention than "[a] person unaware that a crime is being committed"); United States v. Mims, 481 F.2d 636, 637 (2d Cir. 1973) (inferring that "as a victim of the crime[,]" the bank teller was "especially likely to remember the [defendant bank robber's] features").

As to the accuracy of the prior description, Melo told Sgt. Lundy at the scene that his assailant had an M-shaped tattoo on his neck. Diaz points out that the description omits such basics as height, weight, and race. However, "the absence of a detailed description in a situation where prompt police work permits little time for detailed inquiry" does not indicate unreliability. Chavis v. Henderson, 638 F.2d 534, 537 (2d Cir. 1980). At the moment, Melo was bleeding profusely, bobbing in and out of consciousness, and gasping for breath. And although not detailed, Melo's description included the neck tattoo and was

12

in no way inconsistent with Diaz's appearance.    See United States v. Jacobowitz, 877 F.2d 162, 168 (2d Cir. 1989) (this factor favored the government when the prior identification, "though not highly detailed, was accurate").

As to level of certainty, both of Melo's identifications (in the hospital with Det. Martinez, and after viewing the array with S.A. McNeil) were confident, unequivocal, and unhesitating.

As to the length of time between the event and the identification, the show-up took place in the hospital the day after the attack.    Even though three months passed before Melo viewed the array, "an interval of several months between the event and the identification, though a negative factor, is not determinative if it is outweighed by other indicia of reliability."    Concepcion, 983 F.2d at 378; Jacobowitz, 877 F.2d at 168 (holding that a ten-month gap, though "a longer delay than is desirable," did not make identification unreliable).

In sum, nearly all of the Biggers factors support the reliability of Melo's identifications despite the suggestive procedures used to obtain them.

Therefore, the district court did not clearly err in admitting the identification testimony.

## IV

The hearsay statements challenged on appeal were made by either Melo or Ashley and introduced through the testimony of either Det. Martinez or S.A. McNeil. Diaz's primary contention is that the district court contravened Federal Rule of Criminal Procedure 32.1(b)(2)(C) by relying on these hearsay statements without making a finding of good cause. We review admissibility determinations made during a revocation hearing for abuse of discretion. See United States v. Jones, 299 F.3d 103, 112 (2d Cir. 2002).

A district court may revoke supervised release if, after a revocation hearing, it finds by a preponderance of evidence that the defendant violated a condition of release. See 18 U.S.C. § 3583(e)(3); Fed. R. Crim. P. 32.1(b)(2). But a revocation proceeding cannot be equated with a "criminal prosecution in any sense." Morrissey v. Brewer, 408 U.S. 471, 489 (1972). Because the defendant already stands convicted of a crime, the government is not "put to the burden of

14

an adversarial criminal trial."   United States v. Carlton, 442 F.3d 802, 809 (2d

Cir. 2006).   Therefore, the defendant is "not entitled to the full panoply of rights

that criminal defendants generally enjoy."   United States v. Carthen, 681 F.3d

94, 99 (2d Cir. 2012) (internal quotation marks omitted).

Neither the Federal Rules of Evidence nor the Sixth Amendment's

Confrontation Clause apply with full force in a revocation proceeding.   See

United States v. Bari, 599 F.3d 176, 179 (2d Cir. 2010); United States v. Aspinall,

389 F.3d 332, 342–43 (2d Cir. 2004), abrogated on other grounds by United States

v. Booker, 543 U.S. 220 (2005).   This is because a revocation proceeding must be

"flexible enough to consider evidence including letters, affidavits, and other

material that would not be admissible in an adversary criminal trial."

Morrissey, 408 U.S. at 489.   The protections that do apply spring instead from

the Fifth Amendment's Due Process Clause and Federal Rule of Criminal

Procedure 32.1.   See Aspinall, 389 F.3d at 343.

In a revocation proceeding, the defendant is afforded the opportunity to

"question any adverse witness unless the court determines that the interest of

justice does not require the witness to appear."   Fed. R. Crim. P. 32.1(b)(2)(C).

15

When a proffered out-of-court statement made by an adverse witness is not within an established hearsay exception, "Rule 32.1 requires the court to determine whether good cause exists to deny the defendant the opportunity to confront the adverse witness." United States v. Williams, 443 F.3d 35, 45 (2d Cir. 2006). This good cause determination is made by balancing "the defendant's interest in confronting the declarant, against . . . the government's reasons for not producing the witness and the reliability of the proffered hearsay." Id. It is error to admit a hearsay statement that is not otherwise admissible under an established hearsay exception without conducting this balancing test. See id.; United States v. Chin, 224 F.3d 121, 124 (2d Cir. 2000).

### A. Melo's Hearsay Statements

Melo's hearsay statements include: (1) that the attacker had a neck tattoo that looked like the Maserati logo, (2) that Melo was familiar with the attacker and knew him as "Knightmare," and (3) that Melo cut the attacker's face during the assault. Diaz argues that the district court erred by considering these

16

statements without a finding of good cause pursuant to Rule 32.1(b)(2)(C).

We consider for the first time whether Rule 32.1(b)(2)(C) requires that a district court find good cause before admitting hearsay statements made by a witness (like Melo) who testifies.   We conclude that it does not.   Although Rule 32.1(b)(2)(C) guarantees the opportunity to "question any adverse witness unless the court determines that the interest of justice does not require the witness to appear," the decisive point is that Melo *did* appear.   So the district court was not required to make a good cause finding under Rule 32.1(b)(2)(C) before considering his hearsay statements.

The primary function of Rule 32.1(b)(2)(C) is to ensure that a defendant has the opportunity to question adverse witnesses.   See Chin, 224 F.3d at 124 (recognizing that the rule ensures that "a defendant [can] confront adverse witnesses in a revocation proceeding"); United States v. Rondeau, 430 F.3d 44, 48 (1st Cir. 2005) (characterizing Rule 32.1(b)(2)(C) as "a limited confrontation right").   The Advisory Committee notes confirm that "Rule 32.1(b)(2)(C) address[es] the ability of a releasee to question adverse witnesses at the preliminary and revocation hearings."   See Fed. R. Crim. P. 32.1 advisory

17

committee's note to 2002 amendments.   Therefore, Rule 32.1(b)(2)(C) is satisfied when, as here, a hearsay declarant testifies and the defendant has the opportunity to cross-examine him.

Diaz argues that the district court was required to perform the balancing test set forth in Williams before considering the hearsay statements of a person who is both the declarant and a witness.   However, one half of the Williams balancing test concerns "the government's reasons for not producing the witness," 443 F.3d at 45, which would make no sense when, as here, the government *does* produce the witness.

That Rule 32.1(b)(2)(C) was satisfied does not end the inquiry into the admissibility of Melo's hearsay statements.   Although the Federal Rules of Evidence do not apply strictly in a revocation proceeding, evidentiary constraints are not "altogether absent," and a district court's findings must still be "based on 'verified facts' and 'accurate knowledge.'"   See Bari, 599 F.3d at 179 (quoting Morrissey, 408 U.S. at 484).   Verified facts and accurate knowledge are "touchstones" of admissibility in a revocation proceeding.   Id.   "[H]earsay evidence may be admitted in probation revocation hearings if it bears sufficient

18

indicia of reliability." United States v. Stanfield, 360 F.3d 1346, 1360 (D.C. Cir. 2004).

Melo's hearsay statements were reliable and corroborated by other evidence. See Carthen, 681 F.3d at 100 (admitting a victim's hearsay statements when they were "detailed, credible," and "corroborated by other evidence"). Melo's out-of-court description of the attack (the robbery, the stabbing, and the defensive blow) is corroborated by what Pimentel (the 911 caller) heard through his door, and by P.O. Rivera, who testified that Diaz showed up to a meeting days after the attack with a prominent gash on his face. Melo's other out-of-court statements (that his attacker's tattoo resembled the Maserati logo and that he knew his attacker as "Knightmare" from the Lambert Houses) are similarly corroborated by other evidence, including the defendant's neck. Diaz was also residing in an apartment two flights up from where the attack occurred and has a Facebook account with the username "Knightmare.mila." Given that Melo's statements were corroborated by much of the unchallenged evidence in the case, they were reliable, and the district court did not abuse its discretion in considering them.

## B. Ashley's Hearsay Statements

The district court also relied upon several out-of-court statements made by Ashley.   Specifically, it heard (through Det. Martinez's testimony) that Ashley said the perpetrator's nickname was "Knightmare" and that she provided a screenshot of his Instagram profile, which was used to locate Diaz's mugshot.[3] But the government did not call Ashley as a witness nor offer an explanation for why or whether she was unavailable.   And the district court never found that

---

[3] In the government's view, Ashley was not the true author of these statements and therefore, she should not factor into our hearsay analysis.   See Appellee Br. at 32–33.   The government analogizes Ashley to an interpreter and contends that she was merely relaying to Det. Martinez statements made by Melo as he lay nearby in the hospital.   We are unpersuaded.   Because Ashley did not testify, there is no evidence supporting the assertion that she was only relaying Melo's statements, let alone word-for-word.   Therefore, she does not fall into the "interpreter exception," and her statements to Det. Martinez create an additional layer of hearsay.   Cf. United States v. Koskerides, 877 F.2d 1129, 1135 (2d Cir. 1989) (holding that an interpreter was "no more than a language conduit and therefore his translation did not create an additional layer of hearsay" because he "translated . . . statements concurrently as made" and did not have "any motive to mislead or distort").

there was good cause to deprive Diaz of his right to confront her.  The district court thus failed to comply with Rule 32.1(b)(2)(C).  <u>See</u> <u>Williams</u>, 443 F.3d at 45.

That said, "a district court's failure to comply with the interest-of-justice-determination requirement of Rule 32.1(b)(2)(C) . . . is subject to harmless-error analysis."  <u>See</u> <u>Aspinall</u>, 389 F.3d at 346.  And Ashley's hearsay statements amounted to a small fraction of the substantial evidence marshalled against Diaz. Even without her statements, there was ample evidence to support the district court's finding that Diaz had committed the stabbing.  Accordingly, the district court's reliance on Ashley's hearsay was harmless.

## CONCLUSION

For the reasons stated above, the judgment of the district court is affirmed.