**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 16a0417n.06

No. 15-4091

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Jul 27, 2016
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| **Plaintiff-Appellee,** | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE SOUTHERN |
| | ) | DISTRICT OF OHIO |
| DONALD JESSIE, | ) | |
| | ) | **OPINION** |
| **Defendant-Appellant.** | ) | |
| | ) | |

Before: GUY, BOGGS, and MOORE, Circuit Judges.

**KAREN NELSON MOORE, Circuit Judge.** Defendant-Appellant Donald Jessie appeals from the district court's order revoking his supervised release and imposing a sentence of 48 months of imprisonment. The district court found by a preponderance of the evidence that Jessie committed six supervised-release violations, including a domestic-violence crime and a felonious assault. Jessie contends on appeal that the district court's sentence was procedurally unreasonable, that the district court denied Jessie his right to confront witnesses at his revocation hearing, and that insufficient evidence supported the district court's finding that Jessie committed the two alleged crimes. For the reasons discussed below, we **AFFIRM** the district court's judgment finding that Jessie violated the conditions of his supervised release. However, because we agree with Jessie that the district court committed procedural error in imposing its sentence, we **VACATE** Jessie's sentence and **REMAND** for resentencing.

**I.  BACKGROUND**

In 2006, Jessie pleaded guilty in the United States District Court for the Southern District of West Virginia to one count of conspiracy to "possess[] with intent to distribute more than 50 grams of cocaine base, cocaine, and hydrocodone," in violation of 21 U.S.C. § 846.  R. 2 (Transfer Docs. at 15) (Page ID #16).  Jessie was sentenced to 196 months of imprisonment, to be followed by five years of supervised release.  *Id.* at 16–17 (Page ID #17–18).  Jessie's term of imprisonment was later reduced, and he began serving his period of supervised release on January 18, 2011.  R. 1 (Transfer of Jurisdiction at 1) (Page ID #1).  In December 2013, jurisdiction over Jessie's supervised release was transferred to the United States District Court for the Southern District of Ohio.  *Id.*

**A.  Jessie's Supervised-Release Violations**

On May 26, 2015, the U.S. Probation Office ("USPO") filed a Petition for Warrant recommending that Jessie's supervision be revoked because Jessie had violated the mandatory supervised-release condition that he "not commit another federal, state, or local crime."  R. 11 (Petition for Warrant at 2).[1]  Specifically, "[o]n April 4, 2015, Mr. Jessie was charged with Domestic Violence in Franklin County Municipal Court" based on an alleged incident involving his wife, Tyra Whitlow.  *Id.*; Supervised Release Violation Report ("SRVR") at 3.  The USPO filed a Supervised Release Violation Report that set forth the factual basis for Jessie's arrest and

---

[1]The Petition for Warrant was filed under seal at the district court and does not have Page ID numbers; the Supervised Release Violation Report, Supervised Release Violation Report Addendum, and Amended Violation Report were not filed electronically in the district court and accordingly do not have a corresponding record citation or Page ID numbers.  These documents have been provided to us on appeal, and we assume from the record that each of these reports was presented to the parties and the district court below.

the recommended range of imprisonment provided in the Chapter Seven policy statements of the U.S. Sentencing Guidelines. SRVR at 3–4. The USPO recommended that Jessie be sentenced to 10 months of imprisonment, a sentence within the recommended Guidelines range of 5 to 11 months. *Id.* at 4. On June 1, 2015, the district court issued a warrant for Jessie's arrest. R. 12 (Arrest Warrant at 1) (Page ID #86).

On June 22, 2015, the USPO submitted an addendum to its Supervised Release Violation Report notifying the district court that Jessie was arrested on June 10, 2015, for felonious assault. SRVR Addendum at 1. This arrest arose out of an incident on May 9, 2015, in which Jessie allegedly "brandished a firearm and shot the victim," Changler Amilcar, "in the leg." *Id.*; *see also* R. 37 (Revocation H'rg Tr. at 55) (Page ID #313). The addendum also noted four additional violations of the conditions of Jessie's supervised release, including failing to report to his probation officer, failing to notify his probation officer of his arrest, failing to refrain from unlawful drug use, and failing to maintain lawful employment. SRVR Addendum at 1–2. The USPO submitted an Amended Violation Report to the district court on July 23, 2015. Amended Violation Report at 1. The amended report indicated that, given Jessie's new charges, the classification of his violation changed "from a Grade C to a Grade A violation." *Id.* at 2. The amended report calculated Jessie's Guidelines range as 30 to 37 months of imprisonment "based on a Criminal History Category III, a Grade A violation," and his underlying "Class A felony." *Id.* at 3. The USPO recommended that Jessie serve a term of 20 months of imprisonment. *Id.*

## B.  Supervised-Release-Revocation Proceedings

The district court held a revocation hearing on August 26, 2015.  R. 37 (Revocation H'rg Tr. at 3) (Page ID #261).  Jessie conceded, through counsel, to violating his supervised-release conditions relating to failure to maintain employment and failure to refrain from unlawful drug use; Jessie contested the remaining violations.  *Id.* at 5 (Page ID #263).

The government called USPO Officer Edward Boone to testify.  *Id.* at 6 (Page ID #264). Officer Boone stated that he discussed Jessie's domestic-violence charge with the local prosecutor, that he reviewed the underlying police reports, and that he spoke with Whitlow— who herself was not present to testify—about the incident.  *Id.* at 10–11 (Page ID #268–69). Jessie objected to Officer Boone's testimony, arguing that "under Rule 32 [of the Federal Rules of Criminal Procedure], the Court has to make a determination as to why they would be permitted to proceed with this hearsay evidence without [Whitlow] appearing at all."  *Id.* at 11– 12 (Page ID #269–70).   After the district court questioned the U.S. Deputy Marshal who attempted to serve Whitlow her subpoena, the district court preliminarily allowed Officer Boone's testimony, concluding that the hearsay evidence was reliable and that "there was a good faith effort to serve [Whitlow] with a subpoena" but "that it [wa]s very likely that" Whitlow was intentionally avoiding service.  *Id.* at 18–21 (Page ID #276–79).

Officer Boone then testified about Whitlow's account of the domestic-violence incident. Whitlow told Officer Boone that Jessie "became upset" while Whitlow was a passenger in a car that Jessie was driving.  *Id.* at 21 (Page ID #279).  Jessie "poured . . . Nair over [Whitlow's] head

4

and slammed her head up against the dashboard twice" before driving their vehicle "into a parked car." *Id.* at 21–22 (Page ID #279–80). According to Officer Boone, Whitlow's account corroborated the police report of the incident. *Id.* at 22 (Page ID #280).

Law-enforcement officers also testified about Jessie's alleged shooting of Amilcar on May 9, 2015. Officer Donald Olson of the Columbus Police Department testified that he was dispatched to a shooting on Leona Drive and, on the way to the scene, he intercepted Amilcar and his girlfriend, Ebony Wharton, leaving for the hospital. *Id.* at 50–51 (Page ID #308–09). Wharton told the officers that "her friend's baby's daddy," whose "name was Blue," had "c[o]me over to pick up her friend, and they got in a physical argument" and Amilcar attempted to "break [it] up." *Id.* at 52 (Page ID #310). Officer Olson questioned Amilcar at the hospital, who "stated that he knew [the shooter] and that his name was Blue and that he was his girlfriend's friend's baby's daddy." *Id.* at 53 (Page ID #311). Officer Boone testified that Jessie goes by "Boo" or "Blue." *Id.* at 8 (Page ID #266).

Detective Delbert Chapman of the Columbus Police Department Assault Unit also interviewed Amilcar and Wharton on the evening of May 9. *Id.* at 60–61 (Page ID #318–19). Detective Chapman testified that Amilcar stated that "Blue had shot him," but Amilcar did not identify Jessie in a photo array. *Id.* at 62–64 (Page ID #320–22). Detective Chapman explained, however, that Jessie's photo in the array "was a picture from 14 years ago." *Id.* at 64 (Page ID #322). Detective Chapman spoke to Wharton after intercepting her vehicle on the way to the hospital; Wharton explained that she "had been out all day" with Whitlow and when Jessie

"c[a]me over to pick [Whitlow] up . . . there was some type of argument" and Jessie shot Amilcar in the leg. *Id.* at 65–66 (Page ID #323–24). Detective Chapman further testified that he spoke with Whitlow at the scene and Whitlow "stated pretty much the same thing Mrs. Wharton did." *Id.* at 67 (Page ID #325). Whitlow "identified Mr. Donald Jessie as the man she saw shoot Mr. Amilcar." *Id.* at 68 (Page ID #326). A 911 call identifying Jessie as the shooter was also played. *Id.* at 73, 78 (Page ID #331, 336).

The government subpoenaed Amilcar to testify; when first called to testify, however, Amilcar "refused to come into th[e] courtroom." *Id.* at 47 (Page ID #305). Amilcar later "changed his mind" and took the stand. *Id.* at 54–55 (Page ID #312–13). Amilcar stated that he "already" explained the May 9 incident to officers at the hospital. *Id.* at 56 (Page ID #314). At the district court's urging, Amilcar stated further: "I got shot. It was dark. I got shot, and the cops came and took me to the hospital. That's what happened." *Id.* Amilcar testified that he "d[idn't] know" who shot him and that he did not know Jessie's name. *Id.* at 56–57 (Page ID #314–15). According to Amilcar, "Blue" shot him, but he "d[oes not] know who Blue is." *Id.* at 57 (Page ID #315). Amilcar did not "recognize Blue or the person who shot [him] . . . in th[e] courtroom." *Id.* at 59 (Page ID #317).

The district court issued a written memorandum opinion and order on September 22, 2015. R. 31 (09/22/15 Op. at 1) (Page ID #114). The district court made a final determination that, under Rule 32.1 of the Federal Rules of Criminal Procedure, Jessie's interest in confronting Whitlow was not outweighed by "the government's good cause for denying confrontation." *Id.*

6

at 18 (Page ID #131). The district court also concluded that a preponderance of the evidence supported a finding that Jessie committed six supervised-release violations, including the assault of Amilcar and the domestic-violence crime against Whitlow. *Id.* at 18–19 (Page ID #131–32).

## C. Sentencing Hearing

A sentencing hearing was held on October 2, 2015. R. 38 (Sentencing H'rg Tr. at 2) (Page ID #346). Jessie argued that the appropriate sentence was "the original recommendation by [the USPO] of 10 months" of imprisonment. *Id.* at 4–5 (Page ID #348–49). The government, by contrast, argued that the appropriate sentence was the twenty-month term of imprisonment that the USPO recommended in the amended supervised-release-violation report. *Id.* at 5–6 (Page ID #349–50).

The district court then announced its sentence, explaining: "Beginning with the guideline sentencing range and available sentences under the guidelines, the guideline range in this case for a Grade A violation is 30 to 37 months, and the guideline range for the Grade C violations is 5 to 11 months. The statutory maximum is 60 months." *Id.* at 6 (Page ID #350). The district court cited several § 3553(a) factors and noted the seriousness of Jessie's original offense conduct. *Id.* at 6–7 (Page ID #350–51). The district court also explained that Jessie's "violation conduct in this case constitutes a serious breach of the trust reposed in him by the Court's reduction in his sentence and his early release." *Id.* at 7 (Page ID #351). The district court continued: "In light of the violation behavior . . . it appears that the sentence imposed on the defendant in the original drug conspiracy case, as later reduced, was not adequate to promote

respect for the law or to afford adequate deterrence or to protect the public from more crimes by the defendant, and that an additional substantial sanction is required in this case." *Id.* at 8 (Page ID #352). The district court "impos[ed] a sentence of 11 months incarceration on each of the Grade C violations to run concurrently with each other" and "a sentence of 37 months on the Grade A violation" to be served "consecutive[ly] . . . to the sentences imposed on the Grade C violation." *Id.* at 9 (Page ID #353).

Final judgment was entered on October 5, 2015, *see* R. 35 (Order and Judgment at 1) (Page ID #256), and Jessie timely appealed, R. 36 (Notice of Appeal) (Page ID #258).

## II. DISCUSSION

Jessie raises three arguments on appeal. First, Jessie contends that the district court committed procedural error in imposing his sentence. Appellant Br. at 8. Second, Jessie argues that the district court denied his "right to confront the witnesses against him" at his revocation hearing. *Id.* at 12. Finally, Jessie argues that "the [g]overnment presented insufficient evidence to support" the district court's finding that he violated the terms of his supervised release. *Id.* at 17. We consider each of these arguments in turn.

### A. The District Court Erred in Sentencing Jessie

Jessie first contends that his sentence was procedurally unreasonable. Generally, "[w]e review for abuse of discretion the sentence imposed by a district court upon revocation of supervised release." *United States v. Johnson*, 640 F.3d 195, 201 (6th Cir. 2011). "In reviewing for procedural reasonableness, a district court abuses its discretion if it 'commit[s] [a] significant

procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence— including an explanation for any deviation from the Guidelines range." *Id.* at 201–02 (quoting *Gall v. United States*, 552 U.S. 38, 51 (2007)). Here, however, Jessie failed to object during his sentencing after the district court asked for objections, and his procedural-reasonableness claim is accordingly subject to plain-error review. *See United States v. Vonner*, 516 F.3d 382, 386 (6th Cir. 2008) (en banc). Jessie must "show (1) error (2) that was obvious or clear, (3) that affected [his] substantial rights and (4) that affected the fairness, integrity, or public reputation of the judicial proceedings." *Id.* (internal quotation marks omitted).

We agree with Jessie that the district court committed plain error in imposing its sentence. "[T]he district court must consider the policy statements contained in Chapter Seven of the Sentencing Guidelines," in addition to the factors provided in § 3553(a), "[i]n imposing a term of imprisonment following revocation of supervised release." *United States v. Bolds*, 511 F.3d 568, 579 n.5 (6th Cir. 2007) (internal quotation marks omitted). The Chapter Seven policy statements "provide suggested ranges for appropriate sentences based upon the grade of supervised release violation"—either Grade A, B, or C—"and the criminal history category of the defendant." *Id.*; *see also* U.S.S.G. §§ 7B1.1(a) & 7B1.4. In revoking a defendant's supervised release and imposing a prison sentence, these policy statements "are 'the starting point and initial benchmark' of [a district court's] sentencing analysis." *Bolds*, 511 F.3d at 579

9

& n.5 (quoting *Gall*, 552 U.S. at 49). Accordingly, our procedural-reasonableness review begins by "ensur[ing] that the district court 'correctly calculate[ed] the applicable Guidelines range'" provided in Chapter Seven. *Id.* at 579 (quoting *Gall*, 552 U.S. at 49).

The district court found by a preponderance of the evidence that Jessie committed six violations of the conditions of his supervised release. The first five of these qualified as Grade C violations, the lowest grade under § 7B1.1, because the violations consisted of "a federal, state, or local offense punishable by a term of imprisonment of one year or less; or [] a violation of any other condition of supervision." U.S.S.G. § 7B1.1(a)(3); R. 35 (Order and Judgment at 1–2) (Page ID #256–57). Section 7B1.4 recommends a range of 5 to 11 months of imprisonment for a Grade C violation and Jessie's Criminal History Category of III. *See* U.S.S.G. § 7B1.4. Jessie's felonious assault of Amilcar, however, constituted a Grade A violation, "a federal, state, or local offense punishable by a term of imprisonment exceeding one year that [] is a crime of violence [or] is a controlled substance offense . . . ." *Id.* at § 7B1.1(a)(3); R. 35 (Order and Judgment at 2) (Page ID #257). When the defendant's underlying felony is, like Jessie's, "a Class A felony," § 7B1.4 recommends a range of 30 to 37 months of imprisonment for a Grade A violation and a Criminal History Category of III. U.S.S.G. § 7B1.4(a)(2).

Significantly here, § 7B1.1(b) directs that "[w]here there is more than one violation of the conditions of supervision . . . the grade of the violation is determined by the violation having the most serious grade." Put another way, "[w]here there are multiple violations, the most serious grade controls for revocation purposes." *United States v. Childress*, 468 F. App'x 471, 474 (6th

10

Cir. 2012); *see also United States v. Lindo*, 52 F.3d 106, 108 (6th Cir. 1995). Accordingly, because Jessie's most serious supervised-release violation was a Grade A, the Chapter Seven policy statements recommend a range of 30 to 37 months of imprisonment. U.S.S.G. § 7B1.4(a).

This recommended range was not the district court's "starting point." *Gall*, 552 U.S. at 49. Rather, the record demonstrates that the district court failed to understand that Jessie's "most serious grade controls for" the purposes of determining his recommended range of imprisonment. *Childress*, 468 F. App'x at 474. In imposing Jessie's sentence, the district court stated: "[b]eginning with the guideline sentencing range and available sentences under the guidelines, the guideline range in this case for a Grade A violation is 30 to 37 months, and the guideline range for the Grade C violations is 5 to 11 months." R. 38 (Sentencing Tr. at 6) (Page ID #350). After discussing several of the sentencing factors provided in § 3553(a), the district court explained that it was "imposing a sentence of 11 months incarceration on each of the Grade C violations to run concurrently with each other" and "a sentence of 37 months on the Grade A violation, and that will be a consecutive sentence to the sentences imposed on the Grade C violation," resulting in a total sentence of 48 months of imprisonment. *Id.* at 9 (Page ID #353). At no point in the record did the district court indicate that Jessie's recommended range of imprisonment was a total of only 30 to 37 months based on his Grade A violation and his Criminal History Category of III. The district court's statements instead show that the district court was considering Jessie's Grade A violations *and* Grade C violations for purposes of calculating a Guidelines range of imprisonment, contrary to the policy statement's direction that

11

Jessie's Grade A violation should "control[]" in determining the recommended sentencing range. *Childress*, 468 F. App'x at 474; U.S.S.G. § 7B1.1(b).

"[T]he guidelines range, while clearly only advisory in the post-*Booker* regime, is nevertheless a logical starting point from which a district court crafts a sentence," and "[t]o the extent that this starting point was incorrect . . . it is certainly possible that the overall sentence was incorrect as well." *United States v. Story*, 503 F.3d 436, 439–40 (6th Cir. 2007). We have accordingly found that a district court commits procedural error by beginning from an incorrect Guidelines range, even if "the district court d[oes] an admirable job of considering the 3553(a) factors" in imposing a sentence. *Id.* at 439. Here, although the district court discussed the § 3553(a) factors and correctly stated the recommended terms of imprisonment for *each* of Jessie's violations, the district court did not "begin[]" with the appropriate recommended sentencing range because the district court considered the recommended range to be based on Jessie's Grade A violation *and* his Grade C violations. *See* R. 38 (Sentencing Tr. at 6, 9) (Page ID #350, 353). Because the district court's "starting point" was incorrect, the district court committed plain error in sentencing Jessie. *Story*, 503 F.3d at 440–41; *see also United States v. Batista*, 415 F. App'x 601, 607 (6th Cir. 2011) ("It is well-established in this circuit that a district court's failure to use a properly-calculated Guidelines range constitutes plain error.").

The government reads the record differently. According to the government, we can presume from the record that the district court implicitly considered the policy statements, that the district court understood that § 7B1.1(b) instructs that "the grade of the violation is

determined by the violation having the most serious grade," and that the district court implicitly *rejected* the policy statement's recommended range of imprisonment. Appellee Br. at 46–47. We disagree.

First, although our Circuit has in some cases "presume[d]" that the district court "considered the recommended sentencing range set forth in the policy statements" when the district court "review[ed] the supervised release violation report" containing the recommended range of imprisonment, *United States v. McClellan*, 164 F.3d 308, 310 (6th Cir. 1999), this presumption does not save the district court's sentence here. The first Supervised Release Violation Report submitted by the USPO was submitted following Jessie's charge for domestic violence. SRVR at 3. The report described the Grade C violation and Jessie's Criminal History Category, and set forth the recommended range of imprisonment as 5 to 11 months. *Id.* at 4. The USPO submitted an Amended Violation Report on July 23, 2015, that discussed Jessie's felonious assault of Amilcar and set forth a recommended range of 30 to 37 months of imprisonment. Amended Violation Report at 2. Although these reports set forth the definitions of Jessie's violation grades and the corresponding Guidelines ranges—ranges that the district court correctly stated on the record—these reports do not explain that "[w]here there is more than one violation of the conditions of supervision . . . the grade of the violation is determined by the violation having the most serious grade." U.S.S.G. § 7B1.1(b). The only sentence within the reports that can be construed as a discussion of this policy statement is a sentence in the amended report that notes that Jessie's assault of Amilcar "changed the Classification of Violations from a

Grade C to a Grade A violation." Amended Violation Report at 2. This is not enough for us to presume that the district court considered § 7B1.1(b) and the effect of Jessie's multiple grades of violation on his recommended sentence, particularly given that the district court's understanding of this policy statement is belied by what the district court stated on the record at sentencing.

Second, and more significantly, we cannot accept the government's invitation to infer on the basis of this record that the district court understood and rejected the recommended policy range, because doing so would contravene the purposes behind our procedural-reasonableness review. The government makes much of the district court's statement that Jessie's original sentence for his drug conspiracy crime "was not adequate to promote respect for the law or to afford adequate deterrence or to protect the public from more crimes by the defendant, and that an additional substantial sanction is required." R. 38 (Sentencing Tr. at 8) (Page ID #352). According to the government, we can presume from the record that (1) the district court understood that Jessie's recommended sentence was 30 to 37 months of imprisonment, and (2) that because the district court believed that Jessie deserved a "substantial sanction," *id.*, the district court intended to impose a sanction 11 months *above* the recommended Guidelines range. *See* Appellee Br. at 47. It was within the district court's discretion to impose a sentence above the recommended range if properly supported, and this may have been what the district court intended to do, but an equally plausible—if not more so—interpretation of the record is that the district court believed that Jessie's conduct justified a sentence at the *high end of the recommended Guidelines range,* and the district court incorrectly interpreted Jessie's Guidelines

14

range to consist of the recommended terms of imprisonment for both his Grade A and his Grade C violations combined, rather than a range based only on Jessie's Grade A violation.

If the latter interpretation of the record is correct, then the district court started its sentence from an incorrect guidelines range, and as discussed above, this constitutes plain error. But even if the government is correct and the district court intended to vary upwards by 11 months, the district court also committed reversible error. Our cases make clear that "when sentencing outside the advisory range, the district court must 'consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance.'" *Johnson*, 640 F.3d at 205 (quoting *Gall*, 552 U.S. at 50). This is not an empty formality; rather, "[s]uch explanation allows meaningful appellate review" of a district court's sentence, and a district court's failure to explain its sentence constitutes plain error. *Id.* (internal quotation marks omitted); *United States v. Wallace*, 597 F.3d 794, 807 (6th Cir. 2010). Here, if the district court intentionally imposed a sentence above the recommended policy-statement range, the district court failed to "consider the extent of the deviation" and explain why it believed a deviation from the recommended range was required. *See Gall*, 552 U.S. at 50. Indeed, our inability to discern whether the district court even *intended* to vary upwards demonstrates the degree to which the district court's explanation was insufficient, and it also illustrates the important purpose behind our requirement that the district court adequately explain its sentence.

We decline to look past what the district court stated on the record in order to guess at what the district court might have understood. If our mind reading is wrong, then the district

court's misunderstanding of § 7B1.1(b) goes uncorrected, and our very act of making inferences in these circumstances about what the district court might have understood deprives Jessie of his substantial "right to meaningful appellate review." *Wallace*, 597 F.3d at 807. Accordingly, remand for resentencing is required.

**B. The District Court Did Not Err in Admitting Out-of-Court Statements at Jessie's Revocation Hearing**

Jessie next contends that "there was no good basis provided under Federal Rule of Criminal Procedure Rule 32.1 to negate Jessie's right to confront the witnesses against him" at his revocation hearing. Appellant Br. at 12. Neither the Federal Rules of Evidence nor the Sixth Amendment applies to supervised-release-revocation hearings. *See* Fed. R. Evid. 1101(d)(3); *United States v. Kirby*, 418 F.3d 621, 627–28 (6th Cir. 2005). Under the Federal Rules of Criminal Procedure, however a defendant in a revocation hearing "is entitled to . . . an opportunity to . . . question any adverse witness unless the court determines that the interest of justice does not require the witness to appear." Fed. R. Crim. P. 32.1(b)(2)(C). The Advisory Committee Notes to the 2002 Amendments of the Rule provide that "[t]he court is to balance the person's interest in the constitutionally guaranteed right to confrontation against the government's good cause for denying it." We review a district court's balancing of these factors for an abuse of discretion. *See United States v. Coleman*, 570 F. App'x 438, 440 (6th Cir. 2014); *see also United States v. Williams*, 443 F.3d 35, 46 (2d Cir. 2006); *United States v. Rondeau*, 430 F.3d 44, 48 (1st Cir. 2005).

Jessie primarily contends that the district court erred in permitting Whitlow's out-of-court statements to be used against him. *See* Appellant Br. at 13. We disagree. The district court did not abuse its discretion in determining that Jessie's interest in confronting Whitlow did not outweigh the government's "good cause" for failing to call Whitlow to testify. During Jessie's supervised-release-violation hearing, the district court questioned the U.S. Deputy Marshal who attempted, but failed, to serve Whitlow a subpoena. R. 37 (Revocation H'rg Tr. at 14–15) (Page ID #272–73). The Marshal explained that he "received the subpoenas Friday afternoon" and that he "went out Monday morning to [Whitlow's] home" and "spoke with her brother" who explained that Whitlow was not home but that she lived there. *Id.* at 15–16 (Page ID #273–74). The Marshal "left a copy of the subpoena and [his] card and asked that [Whitlow] call [him] immediately so [he] could serve her personally with the subpoena." *Id.* at 15 (Page ID #273). Whitlow never called him back. *Id.* The Marshal then explained that he returned to Whitlow's home "around 6:30 [pm]" the day before the hearing and spoke to Whitlow's mother, who stated that Whitlow "only sometimes lives there." *Id.* at 15–16 (Page ID #274–74). The Marshal stated that he "got two different stories on two different days with not very much cooperation." *Id.* at 16 (Page ID #274). The Marshal left a copy of his card with Whitlow's mother and again requested that Whitlow call him immediately. *Id.* at 15 (Page ID #273). "Both [Whitlow's] brother and mother refused to give [the Marshal] a phone number to call Ms. Whitlow" and "both claimed she was working" and "would not tell [the Marshal] where" Whitlow might be found at work. *Id.* The Marshal also explained that "at one point on Monday morning" he

thought that he saw Whitlow "inside the home," although he could not be certain, and that he believed that Whitlow "was attempting to not be served with the subpoena." *Id.* at 15–16 (Page ID #273–74).

The district court also asked USPO Officer Boone about his conversations with Whitlow. *Id.* at 16 (Page ID #274). Officer Boone explained that he had spoken to Whitlow twice: "the first time [Whitlow] explained to [Boone] what had happened, and then the second time, [Whitlow] said she was trying to work things out with [Jessie] but that what she told [Boone] was true, but she wasn't going to pursue the [domestic-violence] charges" against Jessie. *Id.* at 17 (Page ID #275). Jessie's attorney declined to cross-examine either Officer Boone or the Deputy Marshal about these interactions. *Id.* at 19 (Page ID #277).

The district court made a preliminary finding that the government had shown "good reason" for Whitlow's absence and that the hearsay evidence was reliable, *id.*, and the district court later issued a final ruling on September 22, 2015. R. 31 (9/22/15 Op. at 1) (Page ID #114). The district court explained that "[t]he evidence presented by the government indicates that Whitlow, like many domestic violence victims, was likely avoiding service of process due to her fear of the defendant." *Id.* at 6 (Page ID #119). The district court also found that Whitlow's out-of-court statements were reliable. The district court found that Whitlow's statements during a 911 call on May 9—in which she "told the dispatcher that the shooter was 'Donald Jessie'" and described the shooter and Amilcar—were non-testimonial and, in any case, reliable. *Id.* at 9–11 (Page ID #122–24). The district court further held that Whitlow's other out-of-court statements

18

relating to the incident with Amilcar, contained in police reports from the incident, were also "consistent and corroborate[d] each other." *Id.* at 11–14 (Page ID #124–27). The district court also reviewed Whitlow's out-of-court statements relating to the domestic-violence incident and concluded that these statements were reliable because they were "made soon after the assault," consistent with each other, and "corroborated by physical evidence" such as police photographs. *Id.* at 15–16 (Page ID #128–29). The district court explicitly engaged in a balancing of Jessie's interests in confrontation with the government's reasons for not producing Whitlow and found "that the interest of justice does not require the appearance" of Whitlow or other declarants. *Id.* at 18 (Page ID #131).

Jessie has not demonstrated that the district court abused its discretion in reaching this conclusion. Jessie primarily takes issue with "the Government's one time effort to obtain Whitlow's attendance," Appellant Br. at 15–16, but the Marshal explained his attempts to serve Whitlow on two occasions and the Marshal also discussed his belief that Whitlow was attempting to evade service intentionally. As discussed above, the district court credited this explanation, and the district court explained its own basis for believing that Whitlow was intentionally evading service out of fear of reprisal. R. 31 (9/22/15 Op. at 6) (Page ID #119); R. 37 (Revocation H'rg Tr. at 19) (Page ID #277). The district court also thoroughly explained why it considered Whitlow's statements reliable, R. 31 (9/22/15 Op. at 10–18) (Page ID #123–31), diminishing Jessie's interest in confronting Whitlow. *See Kirby*, 418 F.3d at 628 ("Courts holding revocation hearings consistently have been able to consider hearsay if it is proven to be

reliable." (internal quotation marks omitted)); *United States v. Waters*, 158 F.3d 933, 939–40 (6th Cir. 1998). Jessie has not presented any reason to question the district court's conclusions on the reliability of Whitlow's statements. The district court did not abuse its discretion in holding that Jessie's interest in confronting Whitlow was outweighed by the "good cause" for Whitlow's absence.[2]

## C. The District Court Did Not Err in Finding That Jessie Violated the Terms of His Supervised Release

Finally, Jessie argues that insufficient evidence supported the district court's finding that Jessie committed domestic violence against Whitlow and that Jessie committed felonious assault against Amilcar. Appellant Br. at 17. "In order to revoke supervised release, the sentencing court must find by a preponderance of the evidence that a defendant has violated a condition of his supervised release." *United States v. Cofield*, 233 F.3d 405, 406 (6th Cir. 2000). Sufficient evidence supports the district court's conclusion that Jessie committed the two violations at issue.

First, sufficient evidence supports the district court's finding that Jessie committed the felonious assault against Amilcar. Detective Olson testified at the revocation hearing that Wharton stated on the day of the shooting that "Blue," "her friend's baby's daddy," shot Amilcar. R. 37 (Revocation H'rg Tr. at 52) (Page ID #310). Olson also testified that he

---

[2]Jessie argues in his brief on appeal that the district court also erroneously admitted the statements of other "witnesses who were not present," including "Sarafinah Wharton, Dustin Silker, Karen Silker, and Ebony Wharton," without determining whether their absence was justified by good cause. Appellant Br. at 16. However, Jessie did not raise objections in the district court under Rule 32.1 as to the absence of these individuals, and Jessie does not present any developed argumentation on appeal related to these statements. *See United States v. Robinson*, 390 F.3d 853, 886 (6th Cir. 2004). Jessie has not established that the district court erred in admitting these statements.

interviewed Amilcar at the hospital and that Amilcar stated "that he knew [the shooter] and that his name was Blue and that he was his girlfriend's friend's baby's daddy." *Id.* at 53 (Page ID #311). Further, Detective Chapman testified that he interviewed Amilcar after the shooting and that Amilcar stated that "Blue" shot him. *Id.* at 62–63 (Page ID #320–21). Detective Chapman also interviewed Wharton after intercepting Wharton and Amilcar as they were driving to the hospital after the shooting; Wharton told Detective Chapman that Jessie was the shooter and Wharton identified Jessie from a photo array. *Id.* at 65–67 (Page ID #323–25). Detective Chapman further testified that he spoke to Whitlow at the scene of the shooting and that Whitlow told the same story as Wharton and identified Jessie as the shooter. *Id.* at 67–68 (Page ID #325–26). Jessie was also identified as the shooter during 911 calls that were played. *Id.* at 73 (Page ID #331).

Jessie emphasizes that "Amilcar testified at the hearing[] and informed the court that it was not Jessie that shot him." Appellant Br. at 18. But although Amilcar stated at the hearing that he "do[esn't] know" who shot him, and although Amilcar testified that he did not recognize "Blue or the person who shot" him in the courtroom, R. 37 (Revocation H'rg Tr. at 56–59) (Page ID #314–17), Amilcar did testify that "Blue" shot him, and "Blue" was identified as Jessie's nickname, *see id.* at 57 (Page ID #315). Moreover, Amilcar expressed a general desire not to testify at the revocation hearing, and he was openly reluctant to explain the shooting on the stand. *See id.* at 56 (Page ID #314). Other witnesses testified, as discussed above, that Amilcar made earlier statements that identified "Blue" as the shooter, and other witnesses also testified

that Jessie or "Blue" shot Amilcar. Under these circumstances, "[a] factfinder could plausibly conclude that" Amilcar's earlier statements to law enforcement, "bolstered by other corroborating evidence present here, [were] sufficiently reliable, even if [Amilcar's] later recantation was not." *United States v. Dobson*, 529 F. App'x 536, 539 (6th Cir. 2013). The district court did not err in finding by a preponderance of the evidence that Jessie committed the assault against Amilcar.

Second, sufficient evidence supports the district court's finding by a preponderance of the evidence that Jessie committed the domestic-violence crime against Whitlow. Officer Boone testified as to Whitlow's statements to him about the incident, which were corroborated by the underlying police report and photographs of the incident. R. 37 (Revocation H'rg Tr. at 22) (Page ID #280). Jessie contends that Whitlow is unreliable because she herself had had previous run-ins with the law, Appellant Br. at 19, but Jessie impeached Whitlow's credibility during the revocation hearing, *see, e.g.*, R. 37 (Revocation H'rg Tr. at 36–37) (Page ID #294–95), and the district court did not err in crediting Whitlow's corroborated statements. We find no basis to reverse the district court's finding by a preponderance of the evidence that Jessie committed the domestic-violence crime.

### III. CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's judgment finding that Jessie violated the terms of his supervised release. However, because the district court erred in sentencing Jessie, we **VACATE** Jessie's sentence and **REMAND** for resentencing.