JED S. RAKOFF, U.S.D.J.
On April 7, 2009, defendant Randy Hightower, having been found guilty of being a felon in possession of a firearm, was sentenced to 110 months' imprisonment and two years of supervised release. ECF No. 38. The Probation Office, as here represented by the Government, now charges that the defendant, following the end of his term of incarceration, has twice violated the terms of his supervised release. Specifically, the Government contends that Hightower (1) possessed a loaded firearm, in violation of N.Y. Penal Law § 265.03(3) and (2) had sexual intercourse with another person who was physically helpless, in violation of N.Y. Penal Law § 130.35(2). On October 16, 2017, Hightower denied both specifications. Accordingly, the Court conducted an evidentiary hearing on April 9, 2018 and a supplemental hearing on May 17, 2018, and also received written submissions.
The Government bears the burden to prove by a preponderance of the evidence that the defendant violated a condition of supervised release. 18 U.S.C. § 3583(e)(3). Based on the parties' submissions and the evidence presented, including the Court's assessment of the witnesses' credibility, the Court finds the Government has met its burden with regard to the first specification but not the second. The reasons for these rulings follow.
I. First Specification: Violation of N.Y. Penal Law § 265.03(3)
Hightower's arrest for the conduct underlying the first specification occurred at approximately 10:55 P.M. on October 1, 2017. Transcript dated Apr. 9, 2018 ("Tr.") 3-5. Video footage of the arrest shows an unmarked car driving the wrong way on a one-way street and pulling alongside Hightower, who was on foot and looking at his phone. GX-1. Hightower appears to speak to someone in the car, gesturing briefly with his left hand, which had been by his side (perhaps in his pocket). Immediately after his left hand returns to his side, and just four seconds after the car has stopped, three members of the New York Police Department ("NYPD"), all in plain clothes, exit the vehicle. Hightower steps back and leans against a parked van as the officers approach. One officer searches Hightower's pocket, after which two others pin Hightower's arms down against the van. The frisking officer then displays a firearm, apparently pulled from Hightower's *428 pocket, which he hands to the fourth officer behind him. GX-1.
The gun was later determined to be loaded and operable. GX-3. In a recorded interrogation following the arrest, Hightower acknowledged that he was carrying the gun. GX-4.
Under New York law, "[a] person is guilty of criminal possession of a weapon in the second degree when ... such person possesses any loaded firearm." N.Y. Penal Law § 265.03(3). Hightower without question possessed a loaded firearm in violation of this state law and thus in violation of the terms of his supervised release.
The only question, then, is whether the evidence confirming this violation is admissible. Hightower argues that the stop was unconstitutional because the officers did not have reasonable suspicion that he was involved in any criminal activity, see Terry v. Ohio, 392 U.S. 1, 21-22, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and that the search of his pocket was unconstitutional because the officers had no reasonable suspicion that he was armed and dangerous, see Arizona v. Johnson, 555 U.S. 323, 327, 129 S.Ct. 781, 172 L.Ed.2d 694 (2009). Thus, according to Hightower, all the evidence following the stop and the search of his pocket was obtained in violation of the Fourth Amendment and must be suppressed pursuant to the so-called "exclusionary rule." See Mapp v. Ohio, 367 U.S. 643, 649, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961) ; Wong Sun v. United States, 371 U.S. 471, 488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).
However, the Government argues, and the Court agrees, that the Supreme Court's ruling in Pennsylvania Board of Probation and Parole v. Scott, 524 U.S. 357, 118 S.Ct. 2014, 141 L.Ed.2d 344 (1998) mandates the conclusion that the exclusionary rule does not apply in supervised release proceedings. In Scott, the Court held that the exclusionary rule does not apply in state parole revocation proceedings because the costs of applying this judge-made rule in that context would exceed the benefits: "The exclusion of evidence establishing a parole violation ... hampers the State's ability to ensure compliance with these conditions by permitting the parolee to avoid the consequences of his noncompliance," whereas the "likelihood that illegally obtained evidence will be excluded from trial provides deterrence against Fourth Amendment violations, and the remote possibility that the subject is a parolee and that the evidence may be admitted at a parole revocation proceeding surely has little, if any, effect on the officer's incentives." Id. at 365, 367, 118 S.Ct. 2014.
Although the Second Circuit has not held that the reasoning of Scott applies to federal supervised release revocation proceedings, it has held more generally that "the constitutional guarantees governing revocation of supervised release are identical to those applicable to revocation of parole or probation." United States v. Jones, 299 F.3d 103, 109 (2d Cir. 2002). Several district courts in this circuit, including this one, have therefore refused to apply the exclusionary rule in violation of supervised release proceedings. See United States v. Betances, No. 03-cr-134, ECF No. 206 (Apr. 26, 2012); United States v. Medrano, No. 08-cr-60, 2012 WL 3055758, at *2 (S.D.N.Y. July 20, 2012) ; United States v. Spencer, No. 06-cr-413, 2016 WL 6781225, at *4 (E.D.N.Y. Nov. 15, 2016). Moreover, Hightower offers no reason to believe that applying the exclusionary rule in federal supervised release proceedings would meaningfully deter more unconstitutional conduct or impose fewer societal costs than in state parole violation proceedings. This Court is thus obliged to hold that the exclusionary rule does not apply here, and need not determine whether *429 either the stop or frisk was unconstitutional.[1]
The Court therefore finds the defendant guilty of violating the terms of his supervised release by possessing a loaded firearm in violation of N.Y. Penal Law § 265.03(3).
II. Second Specification: Violation of N.Y. Penal Law § 130.35(2)
The testimony relating to the second specification consists very largely of hearsay. On the morning of January 1, 2017, Tori Brennan called 9-1-1 and reported that she had been raped in an apartment in the Bronx. GX-6. Detective Reiner Fehrenbach of the NYPD later received a notification from Bronx-Lebanon Hospital that Brennan was there and reported having suffered a sexual assault. Tr. 16:19-24. Fehrenbach testified that he went to the hospital, where the emergency room doctor told him that Brennan had told her that "she had woken up with a male on top of her engaging in sexual intercourse and that she did not consent to this act." Id. 17:1-18. Fehrenbach in turn interviewed Brennan later that day, and, as he testified, she told him the following: Around 2:30 A.M. the morning of January 1, Brennan, her brother, and his girlfriend arrived at Monique Belton's apartment in the Bronx for a New Year's Eve party. Id. 18:6-18, 30:20-23. Monique's brother Marcus and his uncle were also at the party. Id. 18:16-18. Brennan had a prior relationship with Marcus, and at some point they had consensual intercourse in a bedroom with the door closed and locked. Brennan then fell asleep and later woke up to find Marcus's uncle on top of her, with his penis inside her vagina. Tr. 19:1-23. She immediately left, went to a nearby family member's house, and then returned to the apartment to confront the others at the party before calling 9-1-1. Id. 20:6-11. Fehrenbach testified that Brennan told him that she did not consent to any intimate or sexual contact with Marcus's uncle. Id. 20:12-18.
Fehrenbach also testified that, on January 2, 2017, Brennan sent him a photograph she took on her phone at the party, and on January 3, 2017, at an in-person meeting, she identified one of the men in the photograph as Marcus's uncle. Id. 22:21-24:4, GX-8, GX-9. At this meeting, Fehrenbach also coordinated a recorded call between Brennan and Monique Belton. Id. 27:21-25; GX-7. In that call, Brennan told Belton a story similar to that which she told Fehrenbach, though Belton confirmed nothing, as she claimed to have been asleep the entire time. See generally GX-7.
On August 16, 2017, Fehrenbach arrested Hightower, at which time Hightower confirmed that he was the man in the picture whom Brennan had identified as Marcus's uncle. Tr. 25:5-26:20. There is no evidence in the record regarding what happened between January 3 and August 16, 2017.
As so often occurs in these unfortunate cases, the alleged victim, here Ms. Brennan, refused to testify. Accordingly, the Government is forced to rely only on Brennan's statements on the 9-1-1 call; on her statements to the emergency room doctor, as relayed to Detective Fehrenbach by the doctor; on her statements to Detective Fehrenbach in their various interviews; and on the recorded conversation with Monique Belton. All of these statements are hearsay, and none falls within any recognized *430 exception to the hearsay rule. The Government does not contend otherwise, but relies on the fact that the protections against hearsay statements in the Confrontation Clause and Federal Rule of Evidence 801 do not apply in hearings involving alleged violations of supervised release. See United States v. Williams, 443 F.3d 35, 45 (2d Cir. 2006).
Nevertheless, due process requires that defendants in supervised release proceeding have "the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation)." Morrissey v. Brewer, 408 U.S. 471, 489, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972) ; see also Fed. R. Crim. P. 32.1(2)(C) (requiring that defendants in such hearings have "an opportunity to appear, present evidence, and question any adverse witness unless the court determines that the interest of justice does not require the witness to appear"). To determine whether good cause exists, "the court must balance, on the one hand, the defendant's interest in confronting the declarant, against, on the other hand, the government's reasons for not producing the witness and the reliability of the proffered hearsay." United States v. Williams, 443 F.3d 35, 45 (2d Cir. 2006).
Pursuant to this case law, the Court held a second proceeding specifically for the Government to put on evidence of its reasons for relying almost exclusively on hearsay. The Government offered no reason for not calling the emergency room doctor who spoke to Brennan the morning of January 1. Transcript Fehrenbach relaying what the emergency room doctor told him that Brennan told her is therefore excluded in its entirety.
The Government did, however, introduce evidence supporting its decision not to call Brennan herself. Special Agent Antoinette Guzman testified that she called Brennan in early 2018 in an effort to convince her to testify, but that Brennan said that she was concerned about the safety of her and her family and so did not want to participate. Id. 6:7-19. In March, Special Agent Guzman served Brennan with a subpoena, at which point Brennan told Agent Guzman that "she would rather just sit in jail than have to come into court." Id. 7:23-8:5.
The evidence thus shows that the Government had very good reason to rely on hearsay evidence rather than call Brennan to testify. See United States v. Jefferies, 456 Fed.Appx. 6, 7 (2d Cir. 2011) (finding no due process violation in the admission of hearsay when the only witnesses with firsthand knowledge had refused to testify). Brennan, whom the Government believes to have been a victim of serious sexual assault, made clear to Special Agent Guzman that she was unwilling to testify because of fear for her family's safety. While this fear may or may not have been justified, the Government's decision to rely on hearsay rather than trying to force Brennan to testify is entirely reasonable.
As to reliability, Brennan's out of court statements are consistent and were all made within a few days of the alleged assault. Moreover, Brennan's actions in calling the police, going to the hospital, and cooperating with Detective Fehrenbach (albeit for only a few days) are consistent with her statements, and the defense put on no evidence of any motive to lie.
Nevertheless, there is no independent evidence in the record corroborating Brennan's account of the criminal act at issue. In the recorded call with Monique Belton, Belton said only that she was asleep the whole time. See GX-7 at 2. The Government produced no hospital records, no sworn statements from Brennan, and no corroborating statements from anyone else (whether in or out of court). Contrast *431 Jefferies, 456 Fed.Appx. at 6-7 (admitting consistent hearsay statements of two unavailable witnesses that were corroborated by medical records).
A criminal defendant always has a substantial interest in cross-examining those whose statements would be used to support his conviction. Here, however, Hightower's interest is at its zenith, as the Government relies exclusively on a single declarant's out-of-court statements to prove its entire case.[2]
To summarize the Williams factors: (1) the Government has shown that it had good reasons for not producing the witness; (2) the hearsay statements, though internally consistent and consistent with the victim's behavior, are not corroborated by any independent evidence; and (3) because the Government's case relies entirely on a single declarant's hearsay, the defendant's interest in cross-examination is at its height.
Under these circumstances, this Court cannot find that there is good cause to admit these hearsay statements. If the Government's inculpatory evidence consists entirely of the unsworn statements of a single declarant, then the defendant has a due process right to put that declarant under oath, subject them to cross-examination, and permit the factfinder to observe their demeanor. See California v. Green, 399 U.S. 149, 158, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970). Other statements from the same declarant cannot suffice, even when, as here, the Court has no specific reason to believe that the out of court statements were not true. Cf. United States v. Carmona, 873 F.2d 569, 574 (2d Cir. 1989) (holding that a sentencing judge may only rely on hearsay from an unidentified source "when there is good cause for not disclosing the identity of the source, and the information he furnishes is subject to corroboration by other means").
Without the excluded hearsay statements, there is insufficient evidence to find the defendant guilty on the second specification.[3]
For the foregoing reasons, the Court finds Hightower guilty of violating the terms of his supervised release by possessing a firearm in violation of New York law, and not guilty of violating the terms of his supervised release by committing rape in violation of N.Y. Penal Law § 130.35(2). The parties shall appear for sentencing on the first violation on July 19, 2018 at 4:00 P.M. Written submissions are not required, but may be submitted by no later than July 12, 2018.

If the Court were writing on a clean slate, it might have reason to conclude that the exclusionary rule should apply here. The Supreme Court's focus on the ex ante effect of the rule ignores the independent deterrent value of an acquittal after a court excludes unconstitutionally obtained evidence.

Although a "defendant's interest is entitled to little weight if the defendant caused the declarant's absence by way of intimidation," United States v. Carthen, 681 F.3d 94, 100 (2d Cir. 2012), and Brennan appears to have not testified out of fear of retaliation, there is no evidence whatsoever that this fear was due to the defendant's actions.

It is well established that courts can, in civil proceedings, draw negative inferences from the defendant's refusal to testify, even when that civil proceeding is quasi-criminal. See Baxter v. Palmigiano, 425 U.S. 308, 318, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976). However, though technically civil, this proceeding bears many of the hallmarks of a criminal trial, including the possibility of imprisonment. As a general matter, the Court is therefore wary to draw a negative inference in supervised release proceedings, and declines to do so here, particularly because a related criminal charge remains open in state court.